UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SCOTT A. HODES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-0161 (CKK) |
| | ) | |
| U.S. DEPARTMENT OF HOUSING AND | ) | |
| URBAN DEVELOPMENT, | ) | |
| | ) | |
| Defendant. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant U.S. Department of Housing and Urban Development respectfully moves for judgment as a matter of law.  In support of this motion, defendant respectfully refers the Court to the attached memorandum of points and authorities, statement of material facts not in genuine dispute, and the declaration of Theodore Foster, Senior Vice President of the Government National Mortgage Association ("Ginnie Mae").

April 26, 2007                              Respectfully submitted,


                                            /s/
                                     JEFFREY A. TAYLOR, D.C. Bar # 498610
                                     United States Attorney


                                            /s/
                                     RUDOLPH CONTRERAS, DC BAR #434122
                                     Assistant United States Attorney


                                            /s/
                                     JOHN F. HENAULT, D.C. Bar # 472590
                                     Assistant United States Attorney
                                     555 4th Street, N.W.
                                     Washington, DC 20530
                                     (202) 307-1249
                                     (202) 514-8780 (facsimile)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SCOTT A. HODES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-0161 (CKK) |
| | ) | |
| U.S. DEPARTMENT OF HOUSING AND | ) | |
| URBAN DEVELOPMENT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Defendant U.S. Department of Housing and Urban Development respectfully submits this statement of material facts as to which there are no genuine disputes in accordance with this Court's Local Rule 7(h).

1.     The Government National Mortgage Association ("Ginnie Mae") is a wholly-owned corporate instrumentality within the Department of Housing and Urban Development ("HUD").  Declaration of Theodore Foster ¶ 1 ("Foster Decl.").

### The Mortgage-Backed Securities Program

2.     Ginnie Mae operates a "Mortgage-Backed Securities Program" ("MBS Program") pursuant to 12 U.S.C. §1721(g) and regulations thereunder, 24 C.F.R. Part 300.  The purpose of the MBS Program is to attract new sources of private capital into federally insured or guaranteed residential lending programs, thereby increasing funds available for the purchase of low- and moderate-income housing.  Under the Ginnie Mae MBS Program, private lenders are permitted to issue securities backed by mortgages or other home loans insured or guaranteed by the Federal Housing Administration, the Department of Veterans Affairs, the USDA Rural Development,

and HUD.  The issuer of the security receives the mortgage payments, and forwards the principal and interest at the security rate to the security holders.[1]  Foster Decl. ¶ 2.

3.      After pooling eligible mortgages to back an issue of securities, an issuer enters into a standard form Guaranty Agreement with Ginnie Mae. Under Section 3.01 of the Guaranty Agreement, the issuer conveys the issuer's right, title and-interest in the mortgages to Ginnie Mae. The issuer retains only nominal title to the mortgages for servicing purposes only. The issuer is responsible for administering and servicing, on its own behalf, the mortgage pool after sale of the securities. To service the mortgage pools, the issuer must collect monthly payments from the mortgagors (which payments may include principal, interest, tax and insurance premium payments), allocate all payments received to the proper account (either the principal and interest account, from which payments are then passed through to the securities holders, or the tax and insurance accounts), collect on delinquent mortgages, implement foreclosure actions when necessary, file insurance or guaranty claims with the appropriate agencies and pay taxes and insurance when due.  Foster Decl. ¶ 3.

4.      Under the Ginnie Mae MBS Program, issuers must make regular and timely payments to the security holders who have purchased Ginnie Mae-backed securities. The issuer is obligated to make timely payments to the securities holders based upon the principal and interest (and any unscheduled recovery of principal) of the terms of the securities.  Foster Decl. ¶ 4.

5.      To protect the security holders from the risks associated with borrower and issuer defaults, Ginnie Mae guarantees the timely payment of principal and interest on the securities.

---

[1] GINNIE MAE operates two MBS programs, GINNIE MAE I and GINNIE MAE II, both of which are in issue in this proceeding. Under GINNIE MAE I, the issuer makes separate monthly payments directly to each holder of securities. Under GINNIE MAE II, a central paying and transfer agent collects payments from the issuer and pays the securities holders. Under both programs, the issuer must pay the security holders whether or not the individual

Congress backed this guaranty by pledging the full faith and credit of the United States Government. Thus, if the issuer is unable to make full and timely payment to the securities holders, the Act provides that Ginnie Mae "shall make such payment as and when due in cash." 12 U.S.C. §1721(g). This guaranty of timely payment is a primary attraction of Ginnie Mae MBS.  Foster Decl. ¶ 5.

6.     Under the Guaranty Agreement, Ginnie Mae reserves the right to terminate an issuer's right to service the mortgages upon an "event of default." Such events include, but are not limited to, impending or actual issuer insolvency, adverse change in the issuer's business status, failure to make timely payments to securities holders, use of funds advanced by Ginnie Mae to make those payments, and failure to otherwise comply with the Guaranty Agreement. Upon default, Ginnie Mae is authorized by the Guaranty Agreement to extinguish the issuer's remaining right, title or interest in the pooled mortgages against which the guaranteed securities were issued.  Foster Decl. ¶ 6.

7.     Ginnie Mae's Guaranty Agreement with issuers of mortgage backed securities requires the issuers to comply with the "Mortgage Backed Securities Guide" issued by Ginnie Mae (the "Guide").  The Guide contains a number of requirements designed to ensure that investors' monies are properly safeguarded, thereby reducing Ginnie Mae's exposure as guarantor of the issuers' obligations.   Foster Decl. ¶ 7.

8.     Under the terms of the Mortgage-Backed Securities Guide, all payments to security holders not delivered to the investor within 6 months must be sent to Ginnie Mae's Central Paying and Transferring Agent ("CPTA"), currently the Bank of New York.  The funds are recorded into the CPTA's database and then transferred to Ginnie Mae's accounts at the Department of Treasury.  Personal and business information that identifies the security holder

mortgagors make their mortgage payments.

and the amount of payments owed is forwarded to the CPTA. The purpose of requiring issuers to send unclaimed or unpaid funds to the CPTA is to ensure that the funds do not escheat to the states under dormant account laws and remain available for payment to security holders.[2] Foster Decl. ¶ 8.

## **The Unclaimed Funds List**

9.     When security holders cannot be located, payments that are due are sent by each issuer to the CPTA. The information from all the issuers is merged together by the CPTA to form an unclaimed funds list. This list database is known as the "Unclaimed Funds List." In addition to business investor information, the Unclaimed Funds List contains consumer information, including the names, addresses and financial information of individuals who have purchased Ginnie Mae Mortgage-Backed Securities. This consumer data is not customarily released by financial institutions. Foster Decl. ¶ 9.

10.     Even after forwarding unclaimed or unpaid funds to the CPTA, the issuers have a continuing obligation to attempt to locate security holders who are due payments, and to document those efforts. In the event that an issuer locates a security holder or receives a claim for payment by a security holder, the issuer requests that the CPTA return the applicable funds previously sent to the CPTA. The CPTA then uses the Unclaimed Funds List to verify that the funds were previously received from the issuer, and returns the applicable funds to the issuer for payment to the investor. As guarantor of the securities, Ginnie Mae has no obligation to locate and pay security holders in these privately-issued securities. Ginnie Mae's obligation is to make

---

[2] In the event of an issuer default as described in paragraph 6, funds related to the mortgages backing securities are also delivered to Ginnie Mae's CPTA; however these funds constitute only .0045% of the funds maintained by the CPTA.

payments when a claim is made by a security holder (and the payee thus located and verifiable) where the issuer has failed to fulfill payment obligations.  Foster Decl. ¶ 10.

**Mortgage-Backed Securities**

11.    Apart from Ginnie Mae, the secondary mortgage market participants include the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and various private label issuers of mortgage-backed securities. Mortgage-backed securities can be held in two different forms - (1) certificated, also known as "physical certificates"; and (2) book-entry.  For certificated securities, the Ginnie Mae issuer has the responsibility of making payment by check to the security holder on the due date.  Securities issued in book-entry form are maintained and issued in a different way.  A book-entry security is an electronic entry in the database maintained by the Federal Reserve Bank of New York ("FRBNY") that keeps the information related to the security and evidences the issuance of the security.  The FRBNY uses same day settlement.  Hence, the payments are sent electronically into the bank account of the security holder, instead of a check being mailed to the security holder.  Foster Decl. ¶ 11.

12.    Since payment on a security issued in book-entry form is made electronically, the likelihood of having unclaimed funds is diminished significantly, if it happens at all. Virtually all mortgage-backed securities issued today are issued in book-entry form.  Fannie Mae and Freddie Mac have not issued securities in a certificated form for many years, and thus do not encounter the problem of unclaimed funds to any significant extent.  Only Ginnie Mae guaranteed mortgage-backed securities can currently be found in certificated form, and only at the request of the security holder.  Therefore, the issue of unclaimed funds is unique to Ginnie Mae's issuers. Foster Decl. ¶ 12.

**Mortgage Backed Securities Investors**

13.     Security holders who buy the Ginnie Mae guaranteed securities fall into two categories: individuals who are security-holders and commercial security holders.  With respect to security holders that are individuals, financial institutions do not release their information due to privacy concerns.  The decision to invest is an important decision for any individual investor, and a very private one.  There are a number of reasons why a security holder would want his or her investment information to remain confidential.  Investors typically do not want their financial information to be publicly available.  It is also the practice in the securities industry to consider such investor information—individual or commercial—confidential.   Foster Decl. ¶ 13.

14.     Releasing identities of individual security holders would also cause significant competitive harm to Ginnie Mae issuers.  If individual security holders who customarily have an expectation of privacy in information held by financial institutions become aware that this information will be released with respect to Ginnie Mae guaranteed securities, it is likely to deter security holders from purchasing Ginnie Mae guaranteed securities in the future.  Foster Decl. ¶ 14.

15.     The financial institutions that issue Ginnie Mae-backed securities would also be competitively harmed by release of information on commercial security holders.  Issuers research potential investors in mortgage-backed securities.  Identifying commercial entities that have purchased Ginnie Mae-guaranteed securities would cause significant competitive harm to Ginnie Mae issuers because other issuers of mortgage-backed securities would solicit these identified security holders to purchase their securities, thus benefiting from data without incurring the time, labor and expense involved in developing their own customer list of security holders interested in mortgage-backed securities.  Once it is known that a certain commercial

security holder is interested in investing in MBS, other entities would solicit its business, causing

a very real harm to Ginnie Mae issuers, who have such security holders as their customers.

Consequently, releasing the identities of commercial investors is akin to releasing the customer

lists of Ginnie Mae issuers.  Foster Decl. ¶ 15.

16.     The financial institutions that issue Ginnie Mae-backed securities would be

competitively harmed by release of information on individual and commercial investors.

Making such information public would cause significant competitive harm to Ginnie Mae issuers

because security holders, who consider anonymity a high priority when making investments with

their businesses' finances, would be disappointed to learn that Ginnie Mae could not keep the

identities of security holders confidential.  The securities market is very competitive.  Disclosure

of such security holder information could adversely affect the pricing of the securities because

other investment securities would retain confidentiality and thus become more attractive to the

investment community.  Currently, Freddie Mac, Fannie Mae and Ginnie Mae are aggressively

competing to secure foreign interest in their mortgage-backed securities.  The disclosure of

security holder identities would likely be announced to the public by the media and cause

devastating harm to Ginnie Mae guaranteed securities in the securities market.  It would clearly

affect Ginnie Mae's strength and reputation for data privacy and in turn affect the amount of

customers Ginnie Mae issuers can attract.   Fannie Mae and Freddie Mac have not issued

securities in a certificated form for many years, and thus do not encounter the problem of

unclaimed funds to any significant extent.  Hence, their investors avoid the risk of their

information being released.  This fact could be used strategically by Fannie Mae and Freddie

Mac to highlight how they stand apart from Ginnie Mae and how they are much more secure and

attractive to security holders.  In the eyes of the security holder this would make a Ginnie Mae-

backed security less desirable and as a result, the Ginnie Mae issuer would lose investors to other issuers of mortgage-backed securities.  Foster Decl. ¶ 16.

17.     The disclosure of information on individual and commercial investors would also make it more difficult for Ginnie Mae to fulfill its mission to increase funds available for the purchase of low and moderate income housing.  There is currently a subprime mortgage market crisis that is resulting in the foreclosure of millions of subprime loans.  Many private label issuers of mortgage backed securities are being forced to buy back the loans and insufficient capital to complete the buy-backs has caused some to file for bankruptcy.  Mortgage lenders have also started tightening their underwriting standards to address this problem.  Consequently, many people who may have qualified for loans a year ago cannot currently qualify for loans under more stringent underwriting standards.  As a result, fewer lower-income families will be able to purchase homes.  Over 80 percent of FHA-insured single family loans are to first-time homebuyers, and over 40 percent of FHA-insured single family loans are to minorities.  Over 90 percent of FHA loans are placed in Ginnie Mae's mortgage backed securities program.  Ginnie Mae's guaranty is backed by the full faith and credit of the federal government, which results in reduced interest rates being paid by FHA borrowers.  If the requested information is released it is likely to impair Ginnie Mae issuers' ability to attract future investors, resulting in less available capital for lenders making FHA-insured loans, and resultant reduced access to mortgage funds on the part of first time and minority homebuyers.   Foster Decl. ¶ 17.

**Plaintiff's FOIA Request**

18.     On December 22, 2004, HUD's FOIA Division directed Mr. Hodes' FOIA request to Ginnie Mae, with a request that a search for responsive documents be conducted.  A copy of the request is attached to my Declaration as Exhibit "A."  The request asks for " a copy

of the payee names, dollar amounts, check numbers, issue dates and payee addresses contained

in Ginnie Mae's Unclaimed Funds System (UFS)."  Foster Decl. ¶ 18.

   19.  Ginnie Mae staff reviewed the Unclaimed Funds database maintained by the

CPTA to determine if the database contained the fields requested—payee names, dollar amounts,

check numbers, issue dates and payee addresses.  All of the fields were contained in the

Unclaimed Funds List database, except for the payee addresses.  In order to obtain payee

addresses, Ginnie Mae would have to search in an alternate database by using the security

holder's social security numbers.  Foster Decl. ¶ 19.

   20.  The information requested in the FOIA request consists of information on

individual and commercial security holders who are due payments from the private sector

entities who sold them securities, as described in paragraph 5 above.  The release of this

information would violate the expectation of privacy of individual investors and cause harm to

the business interests of the issuers of Ginnie Mae backed securities.  Foster Decl. ¶ 20.

April 26, 2007                              Respectfully submitted,


                                                /s/
                                           JEFFREY A. TAYLOR, D.C. Bar # 498610
                                           United States Attorney


                                                /s/
                                           RUDOLPH CONTRERAS, DC BAR #434122
                                           Assistant United States Attorney


                                                /s/
                                           JOHN F. HENAULT, D.C. Bar # 472590
                                           Assistant United States Attorney
                                           555 4th Street, N.W.
                                           Washington, DC 20530
                                           (202) 307-1249
                                           (202) 514-8780 (facsimile)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT A. HODES,                          )
                                         )
                Plaintiff,               )
                                         )
        v.                               )        No. 07-0161 (CKK)
                                         )
U.S. DEPARTMENT OF HOUSING AND           )
URBAN DEVELOPMENT,                       )
                                         )
                Defendant.               )
_____     )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Scott A. Hodes, has filed a Complaint under the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552a, seeking information withheld from him by defendant, the U.S.

Department of Housing and Urban Development ("HUD").[3]  Defendant submits there is no

genuine issue of material fact, and defendant is entitled to judgment as a matter of law as to the

documentation withheld from plaintiff.

**FACTS**

Defendant hereby incorporated its statement of material facts not in dispute as if set forth

herein.

**ARGUMENT**

**I.      SUMMARY JUDGMENT STANDARD**

Where no genuine dispute exists as to any material fact, summary judgment is required.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  A genuine issue of material fact is one

---

[3] Although the named defendant is HUD, Ginnie Mae, a wholly-owned corporate
instrumentality of HUD is the party to whom plaintiff directed his FOIA request.  Accordingly,
this motion will refer to Ginnie Mae.

that would change the outcome of the litigation.  Id. at 247.  "The burden on the moving party

may be discharged by 'showing'—that is, pointing out to the [Court]—that there is an absence of

evidence to support the non-moving party's case."  Sweats Fashions, Inc. v. Pannill Knitting

Company, Inc., 833 F.2d 1560, 1563 (Fed. Cir. 1987).  Once the moving party has met its

burden, the non-movant—here Plaintiff—may not rest on mere allegations, but must instead

proffer specific facts showing that a genuine issue exists for trial. Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Thus, to avoid summary judgment here, Plaintiff

must present some objective evidence that would enable the court to find he is entitled to relief.

        In Celotex Corp. v. Catrett, the Supreme Court held that, in responding to a proper

motion for summary judgment, the party who bears the burden of proof on an issue at trial must

"make a sufficient showing on an essential element of [his] case" to establish a genuine dispute.

477 U.S. 317, 322-23 (1986); see also Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir.

1987) (the non-moving party is "required to provide evidence that would permit a reasonable

jury to find" in its favor).  In Celotex, the Supreme Court further instructed that the "[s]ummary

judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an

integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and

inexpensive determination of every action.'"  477 U.S. at 327 (quoting Fed. R. Civ. Pro. 1).

## II.    SUMMARY JUDGMENT IN FOIA CASES

        The summary judgment standards set forth above also apply to FOIA cases, which are

typically decided on motions for summary judgment.[4]  See Cappabianca v. Commissioner, U.S.

Customs Serv., 847 F. Supp. 1558, 1562 (M.D. Fla. 1994) (citing Miscavige v. IRS, 2 F.3d 366,

---

        [4] For purposes of summary judgment, an agency's decision to withhold information from
a FOIA requester is subject to de novo review by the courts.  Hayden v. National Security
Agency Cent. Sec. Serv., 608 F.2d 1381, 1384 (D.C. Cir. 1979), cert. denied, 446 U.S. 937

368 (11th Cir. 1993)).  In a FOIA suit, an agency is entitled to summary judgment once it

demonstrates that no material facts are in dispute and that each document that falls within the

class requested either has been produced, is unidentifiable, or is exempt from disclosure.  See

Students Against Genocide v. Dept. of State, 257 F.3d 828, 833 (D.C. Cir. 2001); Weisberg v.

U.S. Dept. of Justice, 627 F.2d 365, 368 (D.C. Cir. 1980).

As a practical matter, this standard for summary judgment means that the agency must

provide the Court and the plaintiff with affidavits or declarations and other evidence which show

that the documents are exempt from disclosure.  See, e.g., Center for Nat'l Security Studies v.

U.S. Dep't of Justice, 331 F.3d 918, 927 (D.C. Cir. 2003); Hayden v. National Security Agency

Cent. Sec. Serv., 608 F.2d 1381, 1384, 1386 (D.C. Cir. 1979), cert. denied, 446 U.S. 937 (1980).

Summary judgment may be granted to an agency in a FOIA case solely on the basis of agency

affidavits [or declarations] if the "affidavits are 'relatively detailed, non-conclusory, and not

impugned by evidence . . . of bad faith on the part of the agency.'"  Public Citizen, Inc. v. Dept.

of State, 100 F. Supp.2d 10, 16 (D.D.C. 2000) (quoting McGhee v. Central Intelligence Agency,

697 F.2d 1095, 1102 (D.C. Cir. 1983)); see also Nat'l Security Studies, 331 F.3d at 927.

Typically, the agency's declarations or affidavits are referred to as a Vaughn index, after

the case of Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974).

There is no set formula for a Vaughn index.  "[I]t is well established that the critical elements of

the Vaughn index lie in its function, and not in its form."  Kay v. FCC, 976 F. Supp. 23, 35

(D.D.C. 1997).

The requirement for a Vaughn Index is satisfied by the Defendant's submission of the

declaration of Theodore Foster.  G. Spirko v. United States Postal Service, 147 F.3d 992, 998

(1980).

(D.C. Cir. 1998) (the form of the <u>Vaughn</u> index is unimportant and affidavits providing similar information can suffice).  The Foster Declaration identifies and describes the documents responsive to plaintiff's FOIA request, and sets forth the justification–including the exemption claimed–for the withholding of certain documents.  <u>See</u> Foster Decl. ¶¶ 13-19.

## ARGUMENT

## I.    GINNIE MAE CONDUCTED AN ADEQUATE SEARCH

In responding to a FOIA request, an agency is under a duty to conduct a reasonable search for responsive records.  <u>Oglesby v. U.S. Dept. of Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990); <u>Cleary, Gottlieb, Steen & Hamilton v. Dept. of Health</u>, 844 F. Supp. 770, 776 (D.D.C. 1993); <u>Weisberg v. U.S. Dept. of Justice</u>, 705 F.2d 1344, 1352 (D.C. Cir. 1983).  This "reasonableness" standard focuses on the method of the search, not its results, so that a search is not unreasonable simply because it fails to produce relevant material.  <u>Id</u>. at 777 n.4.  An agency is not required to search every record system, but need only search those systems in which it believes responsive records are likely to be located.  <u>Oglesby</u>, 920 F.2d at 68.  Simply stated, the adequacy of  the search is "dependent upon the circumstances of the case."  <u>Truitt v. Dept. of State</u>, 897 F.2d 540, 542 (D.C. Cir. 1990).

The burden rests with the agency to establish that it has "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  <u>Oglesby</u>, 920 F.2d at 68; <u>SafeCard Servs. v. SEC</u>, 926 F.2d 1197, 1201 (D.C. Cir. 1991).  "An agency may prove the reasonableness of its search through affidavits of responsible agency officials so long as the affidavits are relatively detailed, non-conclusory and submitted in good faith."  <u>Miller</u>, 779 F.2d at 1383; <u>Goland v. CIA</u>, 607 F.2d 339, 352 (D.C. Cir. 1978).  Though the "affidavits submitted by an agency are 'accorded a

presumption of good faith,'" <u>Carney v. Dept. of Justice</u>, 19 F.3d 807, 812 (2d Cir. 1994), <u>cert.</u>

<u>denied</u>, 513 U.S. 823 (1994) (<u>quoting</u> <u>SafeCard Servs.</u>, 926 F.2d at 1200), the burden rests with

the agency to demonstrate the adequacy of its search.  Once the agency has met this burden

through a show of convincing evidence, the burden shifts to the requester to rebut the evidence

by a showing of bad faith on the part of the agency.  <u>Miller</u>, 779 F.2d at 1383.  A requester may

not rebut agency affidavits with purely speculative allegations.  <u>See</u> <u>Carney</u>, 19 F.3d at 813;

<u>SafeCard</u>, 926 F.2d at 1200; <u>Maynard v. CIA</u>, 986 F.2d 547, 559-560 (1st Cir. 1993).

As explained in the Foster Declaration, upon receipt of plaintiff's FOIA request, Ginnie

Mae staff reviewed the Unclaimed Funds database to determine if the fields requested are

contained in the database.  Foster Decl. ¶ 18.  All fields were contained in the database, except

the payee addresses.  Ginnie Mae staff confirmed, however, that the payee address is available

from an alternative database by entering the security holder's social security number.  Foster

Decl. ¶ 18.

## II.    GINNIE MAE PROPERLY WITHHELD INFORMATION UNDER FOIA EXEMPTION 3

Title 5 U.S.C. § 552(b)(3) allows for the withholding or deletion of information

"specifically exempted from disclosure by statute (other than section 552(b) of this title),

provided that such statute (A) requires that the matters be withheld from the public in such a

manner as to leave no discretion on the issue, or (B) establishes particular criteria for

withholding or refers to particular types of matters to be withheld."  <u>Id</u>.  "Exemption 3 differs

from other FOIA exemptions in that its applicability depends less on the detailed factual contents

of specific documents; the ***sole*** issue for decision is the existence of a relevant statute and the

inclusion of withheld material within that statute's coverage."  <u>Goland v. CIA</u>, 607 F.2d 339, 350

(D.C. Cir. 1978), <u>cert. denied</u>, 445 U.S. 927 (1980) (emphasis added).

Pursuant to the Gramm Leach Bliley Act consumer financial privacy rules, financial institutions must keep consumer information private, with a few exceptions. One exception permits disclosures to institutions, such as Ginnie Mae, under certain limited circumstances where recipients have some need for the information. Pub. L. No. 106-102, 113 Stat 1338, 1437, codified at 15 U.S.C. § 6801(c). Specifically, this statute states,

> Except as otherwise provided in this subtitle, a nonaffiliated third party that receives from a financial institution nonpublic personal information under this section shall not, directly or through an affiliate of such receiving third party, disclose such information to any other person that is a nonaffiliated third party of both the financial institution and such receiving third party, unless such disclosure would be lawful if made directly to such other person by the financial institution.

Id. These rules do not, however, permit information recipients to release the information; as such release would defeat the purpose of having privacy rules in the first place.

As explained in the Foster Declaration, the information sought by plaintiff is information received by Ginnie Mae relating to mortgage backed securities from financial institution security issuers. Foster Decl. ¶¶ 2-17. Thus, this information is consumer information within the scope of the Gramm Leach Bliley Act. See 15 U.S.C. § 6809(4); Foster Decl. ¶¶ 9, 10. And, because the release of consumer financial information is expressly precluded from release by the Gramm Leach Bliley Act, Ginnie Mae properly invoked FOIA Exception 3 to withhold such information.

## III.    GINNIE MAE PROPERLY WITHHELD THE INFORMATION OF COMMERICIAL INVESTORS AND INDIVIDUAL INVESTORS UNDER FOIA EXEMPTION 4

As this Court recently explained, FOIA Exemption 4, "protects from public disclosure information that is '(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential.'' 5 U.S.C. § 552(b)(4). As set forth below and in the attached declaration, each of these requirements is satisfied, warranting summary judgment in favor of the defendant. In fact, at least one Court has held that Exemption 4 is appropriate to withhold the type of information

sought by plaintiff.  See Clarke v. Dept. of the Treasury, No. 84-1873, 1986 WL 1234 (E.D. Pa. Jan. 28, 1986).

### A.    Commercial or Financial Information

The terms "commercial or financial" are to be given their "ordinary meanings" for purposes of FOIA Exemption 4.  See Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 28 (D.D.C. 2000)(citing Public Citizen Health Research Group v. FDA, 704 F.2d 1289, 1290 (D.C. Cir. 1983), and Washington Post Co. v. HHS, 690 F.2d 252, 266 (D.C. Cir. 1982)).  Records are deemed to be "commercial" so long as the submitter has a "commercial interest" in them.  See Public Citizen, 704 F.2d at 1290.  These terms should not be limited to records that "reveal basic commercial operations." Id.  Rather, "Exemption may [also] include 'business sales statistics, inventories [and] customer lists.'" Greenberg v. Food and Drug Administration, 803 F.2d 1213, 1216 (D.C. Cir. 1986) (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966)).

The information HUD withheld in this case is "commercial or financial."  The requested information consists of the identities and financial information of individual and commercial investors who have purchased Ginnie Mae guaranteed securities from Ginnie Mae issuers. Foster Decl. ¶¶ 9, 10.  Accordingly, releasing the identities of commercial security holders would be akin to releasing the customer lists of Ginnie Mae issuers.  Foster Decl. ¶ 15.  The security holders' information thus constitutes information that is of commercial interest to the submitting entities.  As the requested information relates to investors' purchase of securities in a commercial market, the data is considered both "commercial" and "financial" in the ordinary meaning of the terms.

### B.    Obtained from a Person

Records are considered to be "obtained from a person" for purposes of FOIA Exemption 4, so long as they were submitted by a "partnership, corporation, association, or public or private organization other than an agency."  See 5 U.S.C. § 551(2); Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 28 (D.D.C. 2000); Allnet Communication Services, Inc. v. FCC, 800 F. Supp. 984, 988 (D.D.C. 1992).  In this case, the security holders' information was submitted to Ginnie Mae by financial institutions that provide investors with Ginnie Mae guaranteed securities.  The records were therefore obtained from a "person" as that term applies to Exemption 4.

### C.    Confidential Information

The information requested by the plaintiff also qualifies as "confidential" under FOIA Exemption 4.  The Court of Appeals for the District of Columbia Circuit has identified several particular interests to be protected, and harm to be avoided, as a basis for determining whether information is "confidential" under Exemption 4.  See Critical Mass Energy Project v. NRC, 975 F.2d 871, 879 (D.C. Cir. 1992).  The first step of analysis focuses on whether the information was submitted involuntarily, e.g., whether the submitter was required to provide the information to the Government.  See Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 903 (D.C. Cir. 1999).  In this case, Ginnie Mae's Agreement with the issuers of mortgage-backed securities requires the issuers to comply with the Guide, which is issued by Ginnie Mae.  Foster Decl. ¶ 7.  The Guide specifically requires that personal and business information that identifies the security holder and the amount of payments owed is forwarded to the Ginnie Mae CPTA, when payments to investors have not been delivered within a six month period, and when a Ginnie Mae issuer has defaulted.  Foster Decl. ¶ 8.

Where, as here, the Government requires a private party to submit information, the information is deemed confidential for purposes of FOIA Exemption 4, if its disclosure is "likely either '(1) to impair the Government's ability to obtain necessary information in the future; (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'"; or (3) to impair administrative efficiency and effectiveness of a governmental interest, See National Parks and Conservation Ass'n v. Morton, 498 F.2d 765, 770 (1974); McDonnell Douglas Corp. v. National Aeronautics & Space Admin., 180 F.3d 303, 306 (D.C. Cir. 1999); see also, 9 to 5 Organization for Women Office Workers v. Board of Governors of Fed. Reserve Sys., 721 F.2d 1 (1st Cir. 1983). The likelihood of competitive harm as well as impairment of a governmental interest both support HUD's withholding of the requested information.

### 1.    The Security Holder's Information Is Confidential Because Its Disclosure Would Cause Substantial Competitive Harm

Exemption 4 protects information wherever there is evidence of "actual competition and a likelihood of substantial competitive injury" to the provider of that information.  Judicial Watch, 108 F. Supp. 2d. at 29 (quoting CNA Fin. Corp. v. Donovan, 830 F.2d 1132, 1152 (D.C. Cir. 1987)).  In assessing whether this element is satisfied, "the Court need only 'exercise its judgment in view of the nature of the material sought and competitive circumstances in which the submitter does business,' but 'no actual adverse effect on competition need be shown.'" Changzhou Laosan Group v. U.S. Customs & Border Prot. Bureau, No. 04-1919, 2005 WL 913268, at 5 (D.D.C. Apr. 20, 2005) (quoting Nat'l Parks & Conservation Ass'n v. Kleppe, 547 F.2d 673, 675 (D.C. Cir. 1976)).  An agency can establish a likelihood of substantial competitive injury by demonstrating that disclosure would provide competitors with pricing advantages, or unfairly advantage competitors in future business negotiations.  National Parks and Conservation

Ass'n, 547 F.2d 673, 684 (D.C. Cir. 1976), Center for Public Integrity v. Dep't of Energy, 191 F.

Supp 2d 187, 194 (D.D.C. 2002); Export-Import Bank, 108 F. Supp 2d at 29.

In this case, HUD withheld the requested security holders' personal and financial

information on Exemption 4 grounds to prevent the Ginnie Mae issuer from suffering substantial

competitive harm. Ginnie Mae operates the MBS Program pursuant to 12 U.S.C. §1721(g) and

regulations thereunder, 24 C.F.R. Part 300. Foster Decl. ¶ 2. Mr. Foster, Ginnie Mae Senior

Vice President, is responsible for the oversight of this program's activities, including the

performance of Ginnie Mae's guaranty obligations, and the compliance of entities participating

in the Ginnie Mae program. Foster Decl. ¶ 1. Accordingly, the predictive judgments and

forecasts set forth in Mr. Foster's declaration regarding the potential repercussions from

disclosure of security holders' information should be accorded deference. Lion Raisins Inc. v.

USDA, 354 F.3d 1072, 1080 (9th Cir. 2004) (senior compliance officer's position and familiarity

with the industry at issue lends considerable weight to his testimony.).

The mortgage-backed securities industry is a highly competitive market in which

financial institutions routinely attempt to distinguish themselves from their competition, in an

effort to make themselves more attractive to investors. Foster Decl. ¶ 16. The information on

Ginnie Mae issuers' security holders sought by the plaintiff includes customers' addresses, and

the amount of payments owed to the investors. Foster Decl. ¶ 17. This information is

customarily not released, because it would provide valuable knowledge to the issuers'

competition. Foster Decl. ¶ 15. The disclosure of personal and business investors' information

in the Ginnie Mae MBS Program would benefit competitors in several ways.

**2.      Individual Investors' Expectation of Privacy**

Although there is a strong presumption in favor of disclosure under FOIA, courts have vigorously protected the personal details of an individual's life, with personal financial information lying near the core of the privacy interests to be protected.  Aronson v. U.S. Department of Housing and Urban Development, et al., 822 F.2d 182, 185 (1st Cir. 1987); see also Gregory v. Federal Deposit Insurance Corp., 470 F. Supp. 1329, 1335 (D.D.C. 1979) (release of personal information such as the size of one's loan, assets, or the collateral put up for a loan, would constitute a clearly unwarranted invasion of personal privacy); Heights Community Congress v. Veterans Administration, 732 F.2d 526 (6th Cir. 1984) (names and social security numbers of recipients of VA loans, property addresses, amount of loans and identities of lenders properly withheld under Exemption 6).  Moreover, it is standard practice in the securities industry to consider such investor information – individual or commercial – confidential.  Foster Decl. ¶ 13.

As a result, releasing personal and financial information of individual security holders would cause a significant competitive harm to Ginnie Mae issuers.  Foster Decl. ¶ 14.  If individual security holders who customarily have an expectation of privacy in information held by financial institutions become aware that this information will be released with respect to Ginnie Mae guaranteed securities, it would likely deter security holders from purchasing Ginnie Mae guaranteed securities in the future.  Foster Decl. ¶ 14.  This would cause substantial harm to the competitive position of Ginnie Mae issuers.

**3.      Competing Entities Would Solicit Ginnie Mae Issuer's Customers**

Issuers of Ginnie Mae guaranteed securities are also likely to suffer competitive harm if the requested information is obtained by marketplace competitors offering similar financial

investment programs.  Foster Decl. ¶ 15.  As we demonstrated above, the securities industry is

highly competitive.  Foster Decl. ¶ 16.  Releasing the identities of commercial security holders is

akin to releasing the customer lists of Ginnie Mae issuers.  Foster Decl. ¶ 15.  Therefore,

identifying commercial entities that have purchased Ginnie Mae guaranteed securities would

cause significant competitive harm to Ginnie Mae issuers, because other issuers of mortgage-

backed securities would solicit the identified security holders to purchase their securities, thus

benefiting from the released data without incurring the time, labor and expense involved in

developing their own customer list of security holders interested in mortgage-backed securities.

Foster Decl. ¶ 15.

Information that is "not the type of information a commercial entity would give to a

competitor" is routinely protected under FOIA Exemption 4.  See Suzhou Yuanda Enterprise,

Co. v. U.S. Customs & Border Protection, 404 F. Supp. 2d 9 (D.D.C. 2005); Gilda Industries,

Inc. v. United States Customs & Border Protection Bureau, 457 F. Supp. 2d 6 (D.D.C. 2006);

Judicial Watch, 108 F. Supp. 2d 29; Webb v. HHS, 696 F.2d 101 (D.C. Cir. 1982); Pub. Citizen

v. FDA, 539 F.Supp. 1320, 1327 (D.D.C. 1982) aff'd in pertinent part, 704 F2d 1280 (D.C. Cir.

1983) (recognizing that the release of product test data would cause "substantial competitive

injury" because "competitors would be receiving, free of charge, the benefits of this costly

research and testing").

**4.     Disclosure Would Impair Ginnie Mae's Ability to Fulfill Its Statutory
       Purpose**

Information is also confidential for purposes of Exemption 4 if its release would impair

an agency's ability to carry out its statutory purposes.  See Judicial Watch v. Export-Import

Bank, 108 F. Supp. 2d 19, 28 (D.D.C. 2000); Comstock International (U.S.A.), Inc. v. Export-

Import Bank of the United States, 464 F.Supp. 804, 808 (D.D.C. 1979) (because commercial

banks and borrowers were reluctant to negotiate loan agreements with the agency absent

assurances of confidentiality, disclosure would interfere with the agency's ability to promote

U.S. exports).  In the instant case, disclosure of the requested information would impair Ginnie

Mae's ability to fulfill its mission to increase funds available for the purchase of low and

moderate income housing by attracting new sources of private capital into federally insured or

guaranteed residential lending programs.  Foster Decl. ¶ 2.

        To establish impairment to the Ginnie Mae program, and thereby justify the finding that

the requested information is "confidential" under FOIA Exemption 4, Ginnie Mae only needs to

demonstrate that disclosure would impair its MBS Program, and the agency is in the best

position to determine the effect of disclosure.  9 to 5 Organization for Women Office Workers v.

Board of Governors of the Federal Reserve System, 721 F.2d 1, 10 (1st Cir. 1983) ("In the

absence of bad faith or abuse of discretion, it is normally not for a court to substitute its

judgment … in determining what otherwise appropriate and relevant data is particularly helpful

in fulfilling the agency's statutory responsibilities, or in defining the most effective means in

acquiring it.").

        Based upon his knowledge and expertise, Mr. Foster has determined and attested that

investors will be discouraged from investing in Ginnie Mae mortgage backed securities without

an expectation that their personal and financial information will be protected from disclosure.

Foster Decl. ¶ 16.  The participants in the secondary mortgage market are in competition with

Ginnie Mae.   Foster Decl. ¶ 11, 18.  Ginnie Mae' s competitors are not required to disclose

commercial or financial information related to security holders to outside parties.  Moreover,

these entities do not issue securities in a certificated form, where the issuer has the responsibility

of making payment by check to the security holder.  Foster Decl. ¶ 12.  Instead, competing

entities issue securities exclusively in book-entry form, where payments are made electronically into the security holders' bank account. Accordingly, the likelihood of having unclaimed funds is diminished significantly. Foster Decl. ¶¶ 11, 12. Therefore, competing entities' investors avoid the risk of their information being released. Foster Decl. ¶ 16. For this reason, investors may choose to seek investment opportunities from competing entities, and not invest in a Ginnie Mae guaranteed security, if those investors must risk the disclosure of this commercial and financial information. Foster Decl. ¶ 16.

Furthermore, if Ginnie Mae were required to release security holders' information, the disclosure would likely be announced to the public by the media, with consequent devastating harm to Ginnie Mae's current competitive position in the securities market. Foster Decl. ¶ 16. With Ginnie Mae currently being in news reports regarding its desire to generate more interest in foreign capital for their securities—competing with Fannie Mae and Freddie Mac—disclosure of security holders' commercial and financial information would clearly affect Ginnie Mae's market position, and reputation for investor privacy. Foster Decl. ¶ 16. Indeed, Ginnie Mae's ability to properly administer its MBS Program, and fulfill its statutory purpose, would be compromised.

In summary, both factors have been met to satisfy the criteria for Exemption 4 protection of commercial and financial information: the information is commercial or financial, it has been obtained from a person, and, most significantly, the requested information is confidential in two distinct respects—substantial competitive harm, and impairment to an agency program. Thus, pursuant to FOIA Exemption 4, Ginnie Mae has properly withheld the requested information.

**IV.    GINNIE MAE PROPERLY WITHHELD INFORMATION AND IDENTITIES OF INDIVIDUAL INVESTORS UNDER FOIA EXEMPTION 6**

Section 552(b)(6) of Title 5 exempts from disclosure information contained in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. ¶ 552(b)(6).  In a definitive decision on the meaning of the term "similar files," the Supreme Court held that Exemption 6 "'[was] intended to cover detailed government records on an individual which can be identified as applying to that individual.'"  Department of State v. Washington Post Co., 456 U.S. 595, 602 (1982) (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess. 11, reprinted in 1966 U.S. Code Cong. & Admin. News 2428); See also New York Times Co. v. NASA 920 F.2d 1002, 1005 (D.C. Cir. 1990) (en banc). This broad construction of "similar files" was necessary in view of Congress's primary purpose in enacting Exemption (b)(6), which was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information. Washington Post Co., 456 U.S. at 599.

Here, the files at issue qualify as "similar files" under Exemption 6, because the Unclaimed Funds List, the database that maintains the requested information, consists of names of investors, as well as the amount of money the investors are owed from their investment. Foster Decl. ¶¶ 9, 10.  Washington Post, 456 U.S. 602; See Aronson v. U.S. Department of Housing and Urban Development, 822 F.2d 182, 185 (1st Cir. 1987); New York Times, 920 F.2d at 1005.

Once it is established that the withheld information meets the threshold requirement of Exemption (b)(6)—that it be in personal, medical, or similar files—a determination must then be made as to whether disclosure would constitute a "clearly unwarranted invasion of personal privacy."  This requires balancing of the individual interest in privacy against the public interest

15

in disclosure.  Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S.

749, 755 (1989); Department of the Air Force v. Rose, 425 U.S. 352, 372 (1976).  The limiting

language, "clearly unwarranted invasion of personal privacy," strikes "a proper balance between

protection of an individual's right of privacy and preservation of the public's right to

Government information by excluding those kinds of files the disclosure of which might harm

the individual."  Department of the Air Force v. Rose, 425 U.S. at 372 (citations omitted).

    The first step in assessing the propriety of information withheld under Exemption 6

requires an identification of the security holder's privacy interest.  See Reporters Committee, 489

U.S. at 763.  The substantial privacy interest that individuals have in their financial information

is well established in the law, especially where the information can be matched to the individual.

See National Parks & Conservation Association v. Kleppe, 5347 F.2d 673, 685 (D.C. Cir. 1976);

Hill v. Department of Agriculture, 77 F. Supp. 2d 6, 7-8 (D.D.C. 1999); Aronson, 822 F.2d at

185 ("the privacy interest becomes more significant, however, when names and addresses are

combined with financial information.");  Gregory v. Federal Deposit Insurance Corporation, 470

F. Supp. 1329, 1335 (D.D.C. 1979) (release of personal information such as the size of one's

loans, assets, or the collateral put up for a loan would constitute a clearly unwarranted invasion

of personal privacy); Heights Community Congress v. Veterans Administration, 732 F.2d 526

(6th Cir. 1984) (names and social security numbers of recipients of VA loans, property

addresses, amount of loans and identities of lenders properly withheld under Exemption 6).

HUD has determined that security holders have a privacy interest in their financial information

related to their Ginnie Mae guaranteed security investment.  Foster Decl. ¶¶ 13,14.

    Conversely, the public interest in disclosure would not shed light on the agency's

performance of its statutory duties.  Under the terms of the Guide, all payments to investors not

16

delivered to the investor within 6 months must be sent to the CPTA, which retains custody of all unclaimed payments from the Ginnie Mae MBS program. Foster Decl. ¶ 7. Personal and business information that identifies the security holder and the amount of payments owed is also forwarded to the CPTA. Foster Decl. ¶ 8. As guarantor of the securities, Ginnie Mae has no obligation to locate and pay investors in these privately-issued securities.[5] Foster Decl. ¶ 10. Ginnie Mae's obligation is to make payments when a claim is made by an investor (payee thus located and verifiable) where the issuer has failed to fulfill payment obligations. Id. Therefore, release of individual investors' personal and financial information from the "Unclaimed Funds List" would only shed light on how the Ginnie Mae issuers are meeting their contractual obligation to make regular and timely payments to the investors who have invested in Ginnie Mae-backed securities. The disclosure of the information is not relevant to any public understanding of Ginnie Mae, and as a result, there is no public interest in the release of this information. Considering the compelling privacy interests of the individual security holders, and the non-existent public interest that would be advanced by disclosing the identities of individual investors and how much they are owed from their financial investment, the requested information is properly withheld under Exemption 6. This Court has repeatedly observed that "even a modest private interest, outweighs nothing every time." National Ass'n of Retired Federal Employees v. Horner, 879 F.2d 873, 879 (D.C. Cir. 1989); accord Beck v. Department of

---

[5] When Ginnie Mae terminates an issuer's right to service mortgages upon an event of a default, the issuer's pooled mortgages become the "absolute property" of Ginnie Mae, subject only to the unsatisfied right of the security holders. Ginnie Mae then contracts with another entity to provide the administrative and servicing functions previously provided by the issuer. During the period of time between the issuer's pooled mortgages becoming the "absolute property" of Ginnie Mae and Ginnie Mae contracting with another entity, Ginnie Mae has a contractual duty to locate and pay security holders. However, this obligation is only temporary and it only accounts for less than half of one percent of the funds in the Unclaimed Funds System.

Justice, 997 F.2d 1489, 1494 (D.C. Cir. 1993).  Because the release of the personal and financial information withheld under Exemption 6 would constitute a clearly unwarranted invasion of privacy, but would shed no light on the agency's operations, HUD properly withheld the information pursuant to FOIA Exemption 6.

## IV.    SEGREGABILITY

The Court of Appeals for the District of Columbia Circuit has held that a District Court considering a FOIA action has "an affirmative duty to consider the segregability issue sua sponte." Trans-Pacific Policing Agreement v. United States Customs Service, 177 F.3d 1022, 1028 (D.C. Cir. 1999).  The FOIA requires that, if a record contains information that is exempt from disclosure, any "reasonably segregable" information must be disclosed after deletion of the exempt information unless the non-exempt portions are "inextricably intertwined with exempt portions."  5 U.S.C. § 552(b); Mead Data Cent., Inc. v. United States Dept. of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).

In order to demonstrate that all reasonably segregable material has been released, the agency must provide a "detailed justification" rather than "conclusory statements." Mead Data, 566 F.2d at 261.  The agency is not, however, required "to provide such a detailed justification" that the exempt material would effectively be disclosed. Id.  All that is required is that the government show "with 'reasonable specificity'" why a document cannot be further segregated. Armstrong v. Executive Office of the President, 97 F.3d 575, 578-79 (D.C. Cir. 1996).

As explained in the Foster Declaration, and detailed above, the only information sought by plaintiff is protected from disclosure by the afore-mentioned exemptions.  Accordingly, there is not non-exempt material that can be released.

## **CONCLUSION**

For the foregoing reasons, defendant U.S. Department of Housing and Urban

Development respectfully requests that the Court enter summary judgment in its favor.

April 26, 2007                                   Respectfully submitted,


                                   /s/
                                   JEFFREY A. TAYLOR, D.C. Bar # 498610
                                   United States Attorney


                                   /s/
                                   RUDOLPH CONTRERAS, DC BAR #434122
                                   Assistant United States Attorney


                                   /s/
                                   JOHN F. HENAULT, D.C. Bar # 472590
                                   Assistant United States Attorney
                                   555 4th Street, N.W.
                                   Washington, DC 20530
                                   (202) 307-1249
                                   (202) 514-8780 (facsimile)

19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT A. HODES,                    )
                                   )
        Plaintiff,                 )
                                   )
                                   )        Civil Action No. 1:07CV00161 (CKK)
                                   )
U.S. DEPARTMENT OF HOUSING AND     )
URBAN DEVELOPMENT,                 )
                                   )
        Defendant.                 )
                                   )
_____    )

## DECLARATION OF THEODORE FOSTER

I, Theodore Foster, do hereby declare and state:

1.      I am a Senior Vice President at the Government National Mortgage Association ("Ginnie Mae"), which is a wholly-owned corporate instrumentality within the Department of Housing and Urban Development (HUD). In my capacity as a Senior Vice President, I am responsible for oversight of all Ginnie Mae program activities, including the performance of Ginnie Mae's guaranty obligations and the compliance of entities participating in the Ginnie Mae program. I have been employed by Ginnie Mae since 1989. I have held my current position since 2002. Prior to assuming this position, I served the Agency in various related capacities including: Vice President of Customer Service and Director of Issuer Management. I have personal knowledge of the matters set forth in this Declaration.

## The Mortgage-Backed Securities Program

2.      Ginnie Mae operates a "Mortgage-Backed Securities Program" ("MBS Program")

pursuant to 12 U.S.C. §1721(g) and regulations thereunder, 24 C.F.R. Part 300. The purpose of

the MBS Program is to attract new sources of private capital into federally insured or guaranteed

residential lending programs, thereby increasing funds available for the purchase of low- and

moderate-income housing. Under the Ginnie Mae MBS Program, private lenders are permitted

to issue securities backed by mortgages or other home loans insured or guaranteed by the Federal

Housing Administration, the Department of Veterans Affairs, the USDA Rural Development,

and HUD. The issuer of the security receives the mortgage payments, and forwards the principal

and interest at the security rate to the security holders.[1]

3.      After pooling eligible mortgages to back an issue of securities, an issuer enters

into a standard form Guaranty Agreement with Ginnie Mae. Under Section 3.01 of the Guaranty

Agreement, the issuer conveys the issuer's right, title and interest in the mortgages to Ginnie

Mae. The issuer retains only nominal title to the mortgages for servicing purposes only. The

issuer is responsible for administering and servicing, on its own behalf, the mortgage pool after

sale of the securities. To service the mortgage pools, the issuer must collect monthly payments

from the mortgagors (which payments may include principal, interest, tax and insurance

premium payments), allocate all payments received to the proper account (either the principal

and interest account, from which payments are then passed through to the securities holders, or

the tax and insurance accounts), collect on delinquent mortgages, implement foreclosure actions

---

[1] GINNIE MAE operates two MBS programs, GINNIE MAE I and GINNIE MAE II, both of which are in issue in this proceeding. Under GINNIE MAE I, the issuer makes separate monthly payments directly to each holder of securities. Under GINNIE MAE II, a central paying and transfer agent collects payments from the issuer and pays the securities holders. Under both programs, the issuer must pay the security holders whether or not the individual mortgagors make their mortgage payments.

when necessary, file insurance or guaranty claims with the appropriate agencies and pay taxes and insurance when due.

4.      Under the Ginnie Mae MBS Program, issuers must make regular and timely payments to the security holders who have purchased Ginnie Mae-backed securities. The issuer is obligated to make timely payments to the securities holders based upon the principal and interest (and any unscheduled recovery of principal) of the terms of the securities.

5.      To protect the security holders from the risks associated with borrower and issuer defaults, Ginnie Mae guarantees the timely payment of principal and interest on the securities. Congress backed this guaranty by pledging the full faith and credit of the United States Government. Thus, if the issuer is unable to make full and timely payment to the securities holders, the Act provides that Ginnie Mae "shall make such payment as and when due in cash." 12 U.S.C. §1721(g). This guaranty of timely payment is a primary attraction of Ginnie Mae MBS.

6.      Under the Guaranty Agreement, Ginnie Mae reserves the right to terminate an issuer's right to service the mortgages upon an "event of default." Such events include, but are not limited to, impending or actual issuer insolvency, adverse change in the issuer's business status, failure to make timely payments to securities holders, use of funds advanced by Ginnie Mae to make those payments, and; failure to otherwise comply with the Guaranty Agreement. Upon default, Ginnie Mae is authorized by the Guaranty Agreement to extinguish the issuer's remaining right, title or interest in the pooled mortgages against which the guaranteed securities were issued.

3

7.    Ginnie Mae's Guaranty Agreement with issuers of mortgage backed securities requires the issuers to comply with the "Mortgage Backed Securities Guide" issued by Ginnie Mae (the "Guide"). The Guide contains a number of requirements designed to ensure that investors' monies are properly safeguarded, thereby reducing Ginnie Mae's exposure as guarantor of the issuers' obligations.

8.    Under the terms of the Mortgage-Backed Securities Guide, all payments to security holders not delivered to the investor within 6 months must be sent to Ginnie Mae's Central Paying and Transferring Agent ("CPTA"), currently the Bank of New York. The funds are recorded into the CPTA's database and then transferred to Ginnie Mae's accounts at the Department of Treasury. Personal and business information that identifies the security holder and the amount of payments owed is forwarded to the CPTA. The purpose of requiring issuers to send unclaimed or unpaid funds to the CPTA is to ensure that the funds do not escheat to the states under dormant account laws and remain available for payment to security holders.[2]

### The Unclaimed Funds List

9.    When security holders cannot be located, payments that are due are sent by each issuer to the CPTA. The information from all the issuers is merged together by the CPTA to form an unclaimed funds list. This list database is known as the "Unclaimed Funds List." In addition to business investor information, the Unclaimed Funds List contains consumer information, including the names, addresses and financial information of individuals who have

---

[2] In the event of an issuer default as described in paragraph 6, funds related to the mortgages backing securities are also delivered to Ginnie Mae's CPTA; however these funds constitute only .0045% of the funds maintained by the CPTA.

4

purchased Ginnie Mae Mortgage-Backed Securities. This consumer data is not customarily released by financial institutions.

10.    Even after forwarding unclaimed or unpaid funds to the CPTA, the issuers have a continuing obligation to attempt to locate security holders who are due payments, and to document those efforts. In the event that an issuer locates a security holder or receives a claim for payment by a security holder, the issuer requests that the CPTA return the applicable funds previously sent to the CPTA. The CPTA then uses the Unclaimed Funds List to verify that the funds were previously received from the issuer, and returns the applicable funds to the issuer for payment to the investor. As guarantor of the securities, Ginnie Mae has no obligation to locate and pay security holders in these privately-issued securities. Ginnie Mae's obligation is to make payments when a claim is made by a security holder (and the payee thus located and verifiable) where the issuer has failed to fulfill payment obligations.

<u>Mortgage-Backed Securities</u>

11.    Apart from Ginnie Mae, the secondary mortgage market participants include the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and various private label issuers of mortgage-backed securities. Mortgage-backed securities can be held in two different forms - (1) certificated, also known as "physical certificates"; and (2) book-entry. For certificated securities, the Ginnie Mae issuer has the responsibility of making payment by check to the security holder on the due date. Securities issued in book-entry form are maintained and issued in a different way. A book-entry security is an electronic entry in the database maintained by the Federal Reserve Bank of New York ("FRBNY") that keeps the information related to the security and evidences the issuance of the

security. The FRBNY uses same day settlement. Hence, the payments are sent electronically into the bank account of the security holder, instead of a check being mailed to the security holder.

12.    Since payment on a security issued in book-entry form is made electronically, the likelihood of having unclaimed funds is diminished significantly, if it happens at all. Virtually all mortgage-backed securities issued today are issued in book-entry form. Fannie Mae and Freddie Mac have not issued securities in a certificated form for many years, and thus do not encounter the problem of unclaimed funds to any significant extent. Only Ginnie Mae guaranteed mortgage-backed securities can currently be found in certificated form, and only at the request of the security holder. Therefore, the issue of unclaimed funds is unique to Ginnie Mae's issuers.

<u>Mortgage Backed Securities Investors</u>

13.    Security holders who buy the Ginnie Mae guaranteed securities fall into two categories: individuals who are security-holders and commercial security holders. With respect to security holders that are individuals, financial institutions do not release their information due to privacy concerns. The decision to invest is an important decision for any individual investor, and a very private one. There are a number of reasons why a security holder would want his or her investment information to remain confidential. Investors typically do not want their financial information to be publicly available. It is also the practice in the securities industry to consider such investor information—individual or commercial—confidential.

14.    Releasing identities of individual security holders would also cause significant competitive harm to Ginnie Mae issuers. If individual security holders who customarily have an expectation of privacy in information held by financial institutions become aware that this

6

information will be released with respect to Ginnie Mae guaranteed securities, it is likely to deter security holders from purchasing Ginnie Mae guaranteed securities in the future.

15.    The financial institutions that issue Ginnie Mae-backed securities would also be competitively harmed by release of information on commercial security holders. Issuers research potential investors in mortgage-backed securities. Identifying commercial entities that have purchased Ginnie Mae-guaranteed securities would cause significant competitive harm to Ginnie Mae issuers because other issuers of mortgage-backed securities would solicit these identified security holders to purchase their securities, thus benefiting from data without incurring the time, labor and expense involved in developing their own customer list of security holders interested in mortgage-backed securities. Once it is known that a certain commercial security holder is interested in investing in MBS, other entities would solicit its business, causing a very real harm to Ginnie Mae issuers, who have such security holders as their customers. Consequently, releasing the identities of commercial investors is akin to releasing the customer lists of Ginnie Mae issuers.

16.    The financial institutions that issue Ginnie Mae-backed securities would be competitively harmed by release of information on individual and commercial investors. Making such information public would cause significant competitive harm to Ginnie Mae issuers because security holders, who consider anonymity a high priority when making investments with their businesses' finances, would be disappointed to learn that Ginnie Mae could not keep the identities of security holders confidential. The securities market is very competitive. Disclosure of such security holder information could adversely affect the pricing of the securities because other investment securities would retain confidentiality and thus become more attractive to the

7

investment community. Currently, Freddie Mac, Fannie Mae and Ginnie Mae are aggressively

competing to secure foreign interest in their mortgage-backed securities. The disclosure of

security holder identities would likely be announced to the public by the media and cause

devastating harm to Ginnie Mae guaranteed securities in the securities market. It would clearly

affect Ginnie Mae's strength and reputation for data privacy and in turn affect the amount of

customers Ginnie Mae issuers can attract. Fannie Mae and Freddie Mac have not issued

securities in a certificated form for many years, and thus do not encounter the problem of

unclaimed funds to any significant extent. Hence, their investors avoid the risk of their

information being released. This fact could be used strategically by Fannie Mae and Freddie

Mac to highlight how they stand apart from Ginnie Mae and how they are much more secure and

attractive to security holders. In the eyes of the security holder this would make a Ginnie Mae-

backed security less desirable and as a result, the Ginnie Mae issuer would lose investors to other

issuers of mortgage-backed securities.

    17.    The disclosure of information on individual and commercial investors would also

make it more difficult for Ginnie Mae to fulfill its mission to increase funds available for the

purchase of low and moderate income housing. There is currently a subprime mortgage market

crisis that is resulting in the foreclosure of millions of subprime loans. Many private label

issuers of mortgage backed securities are being forced to buy back the loans and insufficient

capital to complete the buy-backs has caused some to file for bankruptcy. Mortgage lenders

have also started tightening their underwriting standards to address this problem. Consequently,

many people who may have qualified for loans a year ago cannot currently qualify for loans

under more stringent underwriting standards. As a result, fewer lower-income families will be

8

able to purchase homes. Over 80 percent of FHA-insured single family loans are to first-time homebuyers, and over 40 percent of FHA-insured single family loans are to minorities. Over 90 percent of FHA loans are placed in Ginnie Mae's mortgage backed securities program. Ginnie Mae's guaranty is backed by the full faith and credit of the federal government, which results in reduced interest rates being paid by FHA borrowers. If the requested information is released it is likely to impair Ginnie Mae issuers' ability to attract future investors, resulting in less available capital for lenders making FHA-insured loans, and resultant reduced access to mortgage funds on the part of first time and minority homebuyers.

<u>Plaintiff's FOIA Request</u>

18.     On December 22, 2004, HUD's FOIA Division directed Mr. Hodes' FOIA request to Ginnie Mae, with a request that a search for responsive documents be conducted. A copy of the request is attached to my Declaration as Exhibit "A." The request asks for " a copy of the payee names, dollar amounts, check numbers, issue dates and payee addresses contained in Ginnie Mae's Unclaimed Funds System (UFS)."

19.     My staff reviewed the Unclaimed Funds database maintained by the CPTA to determine if the database contained the fields requested—payee names, dollar amounts, check numbers, issue dates and payee addresses. All of the fields were contained in the Unclaimed Funds List database, except for the payee addresses. In order to obtain payee addresses, Ginnie Mae would have to search in an alternate database by using the security holder's social security numbers.

20.     The information requested in the FOIA request consists of information on individual and commercial security holders who are due payments from the private sector

entities who sold them securities, as described in paragraph 5 above. Based on my experience in

the securities industry and as described in detail above, release of this information would violate

the expectation of privacy of individual investors and cause harm to the business interests of the

issuers of Ginnie Mae backed securities.


     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of April, 2007



Theodore Foster
U.S. Department of Housing and
Urban Development

FI 416811

## SCOTT A. HODES, ATTORNEY AT LAW
### POST OFFICE BOX 42002
### WASHINGTON, DC 20015
### WWW.INFOPRIVACYLAW.COM

MEMBER DC AND MD BARS

December 14, 2004

(301) 404-0502      2004 DEC 14 A 10 26      INFOPRIVACYLAW@YAHOO.COM

Mr. Richard Washington
Acting Assistant General Counsel
Department of Housing and Urban Development
Room 10248
451 7th Street, S.W.
Washington, D.C. 20410

VIA FACSIMILE

Dear Mr. Washington:

This is a request for information under the Freedom of Information Act, 5 U.S.C. § 552.

I request a copy of the payee names, dollar amounts, check numbers issue dates and payee addresses contained in the Ginnie Mae Unclaimed Funds System (UFS).

I will pay all reasonable duplication fees.

I believe that the public interest in this information is the return of these monies to those that rightfully own them. By putting this money back into the economy, it will help fuel growth in the U.S. economy, and create jobs. This public interest outweighs any privacy interest these payees may have.

Please note that any privacy interests of these individuals is also outweighed by their countervailing pecuniary interest in recovering funds owed to them. Lepelitier v. FDIC, 164 F.3d 37 (D.C. Cir. 1999). Furthermore, where these monies are owed to corporate entities, there is no personal privacy to these payees. Thus, the public interest outweighs any privacy interest in this information, and this information should be released to me.

Thank you for your time and consideration. Feel free to contact me at your convenience if you have any questions concerning this request.

Sincerely,

Scott A. Hodes

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SCOTT A. HODES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-0161 (CKK) |
| | ) | |
| U.S. DEPARTMENT OF HOUSING AND | ) | |
| URBAN DEVELOPMENT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## **ORDER**

This matter comes before the Court on defendant's motion for summary

judgment.  After considering all relevant pleadings, applicable law and the record herein,

it is this _____ day of _____, 2007, hereby,

ORDERED, that defendant's motion is GRANTED.  This is a final, appealable

Order.

_____
Colleen Kollar-Kotelly
United States District Judge